UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>BURDLEY JEAN, et al. )<br>) | )<br>CRIMINAL NO. 05-10110-MLW |

UNITED STATES' CONSOLIDATED TRIAL MEMORANDUM

The United States of America submits this memorandum to provide the Court with a general overview of its case-in-chief. The purpose of this memorandum is not to provide an exhaustive recitation of the evidence the government intends to offer at trial, but rather to highlight for the Court principal aspects of the upcoming trial.

OFFENSES CHARGED

Defendants Jude Celestin and Ducarmel Edouard have each been charged in a nineteen count superseding indictment with conspiracy to commit bank fraud, under 18 U.S.C. § 371, and bank fraud, under 18 U.S.C. § 1344. Edouard has been charged with one count of conspiracy and two counts of bank fraud (Counts One, Eleven, and Twelve). Celestin has similarly been charged with one count of conspiracy and five counts of bank fraud (Counts One, Ten, Thirteen, Fourteen, Sixteen, and Seventeen). The superseding indictment also seeks forfeiture of property constituting or derived from the fraud scheme charged in this case. As discussed in greater detail herein, the defendants' individual roles in the conspiracy were unique. The superseding indictment alleges that defendant Burdley Jean ("Jean") devised a scheme to defraud banks by obtaining or creating counterfeit checks using the account information of legitimate bank customers. Jean and other defendants recruited "runners," i.e. persons who physically entered

banks to cash checks. As part of the conspiracy and scheme to defraud, runners were paid from the proceeds of the fraudulent checks.

In 2004, Jean recruited two employees of Fleet Bank (now Bank of America) – defendants Dumornay and Celestin – to participate in the conspiracy. Bank records show that Dumornay and Celestin accessed numerous of the defrauded accounts via their computers during the conspiracy which allowed them to obtain information concerning the account's authorized signor, the amounts of the last several checks drawn on each account, the most recently used check numbers in each account, and each account's balance. Since this information was the same information that was available to tellers to whom the counterfeit checks would be presented, it allowed the conspirators to create counterfeit checks that would appear to the teller to be legitimate.

In most instances, Dumornay and/or Celestin looked at this information in the days immediately before the counterfeit checks were cashed. In several instances, they also looked at this information on the day the checks were being cashed, or thereafter (presumably to track the success of the fraud). In a few instances, they looked at this information exclusively after the fraud occurred. Dumornay and Celestin also spent time searching for account information – querying many other accounts, apparently in an effort to find appropriate targets. The government further intends on introducing evidence that Celestin and Dumornay accessed other bank information in order to determine whether the bank or the account holder had identified the fraudulent activity in the targeted accounts.

Edouard served as a runner in the counterfeit check conspiracy. Specifically, he received checks from Burdley Jean and then cashed these checks at banks located throughout New England. The superseding indictment specifically charges Edouard for his role in cashing

counterfeit checks drawn on the accounts of Mohawk Village Motors, Inc., Starr Realty, Inc., Corporate Realty Group Inc., and Hillside Resource and Management.

Celestin has been charged for his role in accessing accounts in which runners subsequently cashed counterfeit checks, including the following accounts: Fenway Community Health, Westbank Realty Corp., Westbank Realty Corp., and Westgate Recruiting, LLC. As evidence of overt acts in furtherance of the conspiracy, the superceding indictment also alleges that Celestin accessed numerous other accounts that were defrauded.

ELEMENTS OF THE OFFENSES

I.   Conspiracy

The elements of conspiracy (18 U.S.C. § 371) are:

1. That the agreement to violate a federal law as specified in the superseding indictment existed between at least two individuals;

2. That the defendant willfully joined in that agreement; and

3. That one of the conspirators committed an overt act in an effort to further the purpose of the conspiracy.

See First Circuit Pattern Jury Instructions (Criminal) §403; United States v. Piper, 35 F.3d 611, 614-15 (1st Cir. 1994).

II.   Bank Fraud

The bank fraud statute (18 U.S.C. § 1344) provides, in relevant part:

Whoever knowingly executes, or attempts to execute, a scheme or artifice

1. To defraud a financial institution; or

2. To obtain any of the moneys, funds, credits, assets, securities or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises [shall be guilty of a felony]

The elements of this offense are:

1. Defendant executed or attempted to execute;

2. A scheme to defraud a federal financial institution, or to obtain money from a financial institution by false or fraudulent pretenses, representations or promises;

3. The scheme involved material falsehoods; and

4. The defendant acted knowingly.

See United States v. Kenrick, 221 F.3d 19, 30 (1st Cir. 2000); United States v. Brandon, 17 F.3d 409, 424 (1st Cir. 1994); see also Neder v. United States, 527 U.S. 1, 25 (1999) ("[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes.").

Under Section 1344, the terms "scheme" and "artifice" include "any plan, pattern or course of action, including false and fraudulent pretenses and misrepresentations, intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived." United States v. Goldblatt, 813 F.2d 619, 624 (3rd Cir. 1987); accord United States v. Cloud, 872 F.2d 846, 850 (9th Cir. 1989), cert. denied, 493 U.S. 1002 (1989).

There is no single definition of a scheme to defraud. As the First Circuit has noted:

> The term "scheme to defraud" . . . is not capable of precise definition. Fraud instead is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community.

Brandon, 17 F.3d at 424 (quoting Goldblatt, 813 F.2d at 624).

The intent to defraud that is required for a violation of Section 1344 "is an intent to deceive the bank in order to obtain from it money or other property." Kenrick, 221 F.3d at 30. Such fraudulent intent may be proved by circumstantial evidence, and may be established by inference from the evidence of the scheme itself. Brandon, 17 F.3d at 425 (citing United States

4

v. Cloud, 872 F.2d 846, 852 n.6 (9th Cir. 1989)); see also United States v. Mason, 902 F.2d 1434, 1442 (9th Cir.1990) ("Specific intent is established by 'the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension, and this intention is shown by examining the scheme itself.'") (citation and internal quotation omitted).

The United States is not required to prove that the defendant intended to harm any financial institution or that any financial institution suffered a loss as a result of defendant's actions. As the First Circuit has ruled, "the intent element of bank fraud under either subsection [of 18 U.S.C. § 1344] is an intent to deceive the bank in order to obtain from it money or other property." Kenrick, 221 F.3d at 29. Specifically, the court noted, "'Intent to harm' is not required." Id.

Although the government must prove beyond a reasonable doubt that the defendant acted with intent to defraud, the government is not required to prove that the defendant knew that the lenders were federally insured. As the First Circuit has noted, "[t]he status of the victim-institution is not a separate knowledge element of bank fraud under § 1344 but an objective fact that must be established in order for the statute to apply." Brandon, 17 F.3d at 425 (rejecting defendant's contention "that the government must prove that they knew that the victim of their fraud was a federally insured financial institution").

Nor is the government required to prove that the defendant knew which bank he was defrauding. See Brandon, 17 F.3d at 426 (holding that "it is . . . unnecessary for the government to prove that a defendant knows which particular bank will be victimized by his fraud as long as it is established that a defendant knows that a financial institution will be defrauded.").

5

Aiding and Abetting Liability

The aiding and abetting statute defines the crime of aiding and abetting as follows:

(a)   Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b)   Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. §2.

## ANTICIPATED EVIDENCE

Without providing an exhaustive recitation of the evidence the government anticipates presenting, the following are the categories of evidence that, at this time, the government anticipates presenting. As the government prepares for trial, additional categories of evidence may become apparent.

I.   TESTIMONY

In its case-in-chief against Defendant Edouard, the United States anticipates calling several check runners (including Shavonne Noble, Taymashia Tavares, and Patricia Tellus) who participated in the bank fraud conspiracy. These witnesses cashed checks on the same accounts as those on which Edouard cashed checks and are, therefore, in the government's view, evidence that Edouard participated in the check cashing conspiracy. The United States further plans to call bank employees who will testify as to accounts accessed by Dumornay and Celestin during the conspiracy, including accounts in which Edouard cashed checks – again as evidence of Edouard's participation in the conspiracy. Other bank employees will testify as to the authenticity of the bank surveillance photos that show Edouard cashing the counterfeit checks alleged in the indictment. In addition, to the extent necessary, the government will call keepers

of records from the account holders whose accounts were defrauded by Edouard when he cashed the counterfeit checks alleged in the superseding indictment. Finally, the United States intends on calling two agents from the Federal Bureau of Investigation to whom Edouard made admissions as to his participation in the conspiracy. It bears noting (see Trial Issues Section V below), that Edouard's admissions do not directly name or implicate defendant Celestin in the conspiracy but rather are simply admissions that Edouard participated in the check conspiracy and was provided checks by defendant Burdley Jean.

    In its case-in-chief against defendant Celestin, the government intends to call several employees from Fleet Bank/Bank of America who will testify about Celestin's accessing of counterfeited accounts and other insider bank information during the course of the conspiracy. These witnesses are expected to testify as to the information Celestin was able to obtain by accessing these accounts and other bank information – including "fraud alerts." The government further anticipates calling several runners who cashed checks on accounts that Celestin accessed. Some of these runners are expected to testify that other members of the conspiracy informed them that there were bank insiders who were providing information to members of the conspiracy and who were sharing some of the proceeds from the scheme. Another runner (Celina Vital) is expected to testify about telephone conversations she had with defendant Celestin during the conspiracy. The government further intends to call an agent from the Federal Bureau of Investigation to whom Celestin made certain statements when confronted about the conspiracy – including that a defrauded account holder requested that Celestin access his account. The

7

government may further call at least one witness from one of the victim account holders who is expected to testify that he did not request that Celestin access his account.[1]

The government also intends on having Defendant Celestin's sworn statements during the Rule 11 plea colloquy on January 8, 2008 read to the jury as part of its case-in-chief. The government has filed a separate motion *in limine* with respect to this evidence. Again, it bears noting that none of Celestin's admissions implicate defendant Edouard.

Finally, as the government completes its final trial preparations, it anticipates calling at least one co-conspirator witness who has already pleaded guilty and been sentenced. Once it identifies this witness(es), the government will promptly provide Defendants Celestin and Edouard notice and the appropriate disclosures concerning this witness(es)'s statements.

II.   EXHIBITS

The United States anticipates introducing documentary, photographic, and real evidence, including, but not limited to, the following:

> A.   Checks cashed as part of the scheme. Such checks will include checks not expressly charged in the indictment. Such checks are direct evidence of the scheme to defraud.
>
> B.   Bank records, including records showing access by Dumornay and Celestin (the bankers) to defrauded accounts.
>
> C.   Telephone records showing communication between defendant Jean and the bankers in furtherance of the conspiracy.

---

[1] This witness is an eighty-seven year old gentlemen who resides in New Jersey. At this point in time, it is uncertain whether this witness (who has had recent health difficulties) will be willing or able to travel to Boston for the trial. If the parties are unable to obtain a stipulation concerning the substance of his testimony (*i.e.*, that Celestin was not authorized to access his account), the government intends on filing a motion *in limine* to permit this individual to testify remotely from New Jersey via video-teleconferencing or some other means. The government will file any such motion in advance of the pre-trial conference scheduled for May 20, 2008.

    D.    Bank surveillance photographs depicting runners cashing counterfeit checks.

    E.    Summary exhibits demonstrating the links between telephone conversations between defendant Jean and the bankers, access to defrauded accounts by the bankers, and the cashing of counterfeit checks purportedly drawn on those defrauded accounts.

    F.    Defendant Edouard's written confession.

    G.    Stipulations concerning (a) the jurisdictional prerequisites for the bank fraud charges, and (b) the counterfeit nature of several of the checks at issue in the case.[2]

    H.    Certificates attesting to the fact that the defrauded banks were federally insured.

## TRIAL ISSUES

I.    Defendant Edouard's Jurisdictional Claims

In several *pro se* pre-trial motions, Defendant Edouard has raised a number of claims which essentially argue that the Court does not have jurisdiction over him for the instant offenses. See, e.g., Docket Numbers 219, 206, 208, 209, 210, 211, 215, 226. Edouard appears to argue that the United States government was dissolved by the Emergency Bank Act of 1933 and, therefore, the government does not have the authority to prosecute the instant criminal offenses nor does the Court have jurisdiction to hear the case. Courts addressing similar arguments (which appear to be tenants of the "Sovereign Citizens" movement) have rejected such claims as frivolous. See, e.g., United States v. Mitchell, 405 F. Supp. 2d 602, 604 (D. Md. 2005); United States v. Goltz, 2006 WL 3627629 (W.D. Tex. 2006); Sochia v. United States, 2004 WL 1790170 (W.D. Tex. 2004). And, this Court has already denied all of Edouard's motions raising these claims in the instant matter. See Docket Number 235.

---

[2] *See* section III B below for a further discussion of these stipulations.

During pre-trial hearings, Edouard has indicated that he intends on advancing his lack of jurisdiction defense at trial. He has further indicated that he intends on calling up to seven witnesses as part of his defense.

Edouard should be precluded from litigating this issue before the jury at any stage of the proceedings, whether during voir dire, the opening statement, cross-examination of the government's witnesses, presentation of his own witnesses, introduction of exhibits, or the closing argument. As outlined in greater detail in the government's previously filed *motion in limine* (docket number 251), the United States believes that these claims are (a) legal arguments that have already denied by the Court, and are (b) otherwise irrelevant and frivolous issues that should not be presented to the jury. See, e.g., United States v. Lussier, 929 F.2d 25, 27 (1st Cir. 1991) ("It is well settled that a district court has personal jurisdiction over any party who appears before it . . . . 18 U.S.C. § 3231, moreover, gives the district court subject matter jurisdiction over 'all offenses against the laws of the United States.'"); Fed. R. Evid. 401, 402.

II.     Stipulations

On January 8, 2008, as the parties were preparing for the initial trial date in this case, Defendant Edouard, through the assistance of his then court-appointed counsel, entered a stipulation with the United States. That agreement (which was entered into before Edouard sought to terminate his counsel and proceed *pro se)*, stipulated that (a) several of the checks that are issue in the case were presented for payment at federally insured financial institutions, and (b) that the issuance of these checks were not authorized by the legitimate account holders on whose accounts these checks were written.

At this point, it is unclear as to whether Edouard desires to withdraw these stipulations. To the extent the Court permits Edouard to withdraw theses stipulations and precludes the

government from introducing these stipulations at trial, see, e.g., American Honda Motor Company v. Richard Lundgren, Inc. 314 F.3d 17 (1st Cir. 2002) ("Stipulations between parties are not 'absolute' and a party may be relieved of a stipulation for good cause– which means, in a nutshell, that good reason must exist and that relief must not unfairly prejudice the opposing party or the interests of justice.") (internal citations omitted); United States v. Wingate, 128 F.3d 1157, 1160 (7th Cir. 1997) ("[O]nce made, a stipulation is binding unless relief from the stipulation is necessary to avoid 'manifest injustice' or the stipulation was entered into through inadvertence or based on an erroneous view of the facts or law") (internal citations omitted), the government anticipates having to call several witnesses whose accounts were defrauded in the scheme. These witnesses will testify that the checks cashed by Edouard and others in the conspiracy were drawn on their accounts and that these checks were not authorized. The government would further offer FDIC certificates reflecting the insured status of the lending institutions at issue in this case and will call a keeper of the records witness from the FDIC if necessary.

The government and defendant Celestin are still in the process of negotiating stipulations. In that regard, the parties will file these stipulations in accord with the time outlined in the Court's May 20, 2008 Pretrial Order.

    III.    404(b) Evidence

The government may present evidence (in the form of witness testimony) that defendant Jude Celestin was involved in check fraud prior to the period covered by the superseding indictment and that he further sought to participate in counterfeit check activity with an individual not named in the superseding indictment. If the government decides to call this

witness at trial, it will provide the parties and the Court with further details and briefing on this evidence.

The superseding indictment charges, among the overt acts specified in Count One, that defendants Celestin and Dumornay accessed a large number of Fleet accounts. The government intends to introduce evidence that runners cashed numerous checks drawn on those accounts at a time close to when Celestin accessed the accounts. Many of the checks that were cashed (and runners who cashed these checks) are not identified in the superseding indictment. It is the government's position that this evidence is not covered by Rule 404(b), because it is instead direct evidence of the conspiracy.

### IV. Co-Conspirator Statements

The government currently intends on introducing several statements made by co-conspirators, including, without limitation, the following:

(1) Da'ryl Kirkland (an unindicted co-conspirator runner) stated that Shavone Noble (an indicted co-conspirator) told her that Andy Demosthenes (another indicted co-conspirator) had said words to the effect of: "We have people in working inside the banks with us, so there's no way we're going to get caught.";

(2) Katia Almonor (an unindicted co-conspirator runner) stated that Demosthenes told her he had "a connect in the bank";

(3) Patricia Tellus (an unindicted co-conspirator runner) stated that Demosthenes told her (a) not to worry because he had people working inside the bank who could check the computer if anything went wrong; (b) the reason he was paying her so little was because he had to pay others, including the people working inside the bank;

(4) Winckgayasha Lorquet (an unindicted co-conspirator runner) stated that Demosthenes told her that when she presented a counterfeit check to a bank teller, the teller might have to make a call and that Lorquet should not worry because it was routine.

(5) Celina Vital (an unindicted co-conspirator runner) called defendant Jude Celestin to discuss her concerns about her participation in the counterfeit check ring.

        Celestin said words to the effect that he knew the person whom Celina was obtaining the checks (Andy Demosthenes) and that he knew that Demosthenes had messed with other girls.  Immediately following this call, Demosthenes called Vital and told her (words to the effect of ) stop telling people my business.

    (6)    Tyamisha Tavares (an indicted co-conspirator runner) stated that Jean Noriscat a/k/a JA (an indicted co-conspirator) told her that there were people in the bank working on behalf of the conspiracy and that a portion of the proceeds of the conspiracy were shared with these individuals.

All of these statements are statements made during and in furtherance of the conspiracy and are, therefore, admissible under Fed. R. Evid. 801(d)(2)(E).  See, e.g., United States v. Piper, 298 F.3d 47, 54 (1st Cir. 2002) ("[A] coconspirator's statement is considered to be in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy"); United States v. Martinez-Medina, 279 F.3d 105, 117 (1st Cir. 2002) (holding that to be deemed "in furtherance," a statement "need not be necessary or even important to the conspiracy, or even made to a co-conspirator, as long as it can be said to advance the goals of the conspiracy in some way.").  If the government identifies additional co-conspirator statements, it will promptly notify the defendants and be prepared to discuss these statements with the Court at the Pretrial Conference on May 20, 2008.

    V.    Possible Bruton / Crawford Issues

Notwithstanding Defendant Celestin's Motion for Relief from Prejudicial Joinder, the government does not believe that trying Defendants Edouard and Celestin together presents grounds for severance pursuant to Bruton or Crawford.  Although the United States intends to prove that Defendants Edouard and Celestin were part of the same counterfeit check conspiracy, it does not anticipate proving that these two dealt with each other personally.  This is because the United States anticipates proving that these defendants had very different roles in the conspiracy. Defendant Edouard was a "runner" who deposited or cashed certain checks, whereas Defendant

13

Celestin was a bank insider with access to information that would help identify which accounts to defraud, what information was necessary to do so, whether the accounts had sufficient funds worth stealing, whether certain checks had been posted, and whether the check fraud had been discovered. They moved in different circles within the conspiracy, much as would a headquarters employee and a clerical branch employee both working at the same (legitimate) company.

Defendants' division of labor therefore means that certain evidence — by no means, the minority — will be admissible only against one defendant and not the other. To be sure, certain evidence will be dually-admissible, such as evidence that the victim bank was federally insured, that a conspiracy existed, and that Defendant Edouard deposited or cashed certain checks in accounts whose information Defendant Celestin improperly accessed. But certain evidence will not, such as checks that Defendant Edouard cashed from accounts whose information Defendant Celestin did not access, or accounts that Defendant Celestin accessed but from which Defendant Edouard cashed no checks. In these instances, the Court should issue appropriate limiting instructions during and/or at the end of trial. The United States has proposed some limiting instructions among its other proposed jury instructions.

In this regard, the First Circuit recently addressed this issue stating:

> In the context of a multi-defendant trial . . . the admission of a non-testifying defendant's inculpatory extrajudicial statement is carefully limited. Even when such a statement may be introduced against the declarant as an admission, it may not be admitted as to the other defendants unless there is an independent ground for doing so. Vega Molina, 407 F.3d at 522 (citing Crawford, 541 U.S. at 42-50, 124 S. Ct. 1354). Where no alternative basis for admission exists, the trial court should instruct the jury that the out-of-court statement may be considered as evidence only against the declarant and not against his co-defendants. Id.; see also Richardson v. Marsh, 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987) (finding no Confrontation Clause violation where co-defendant's confession was admitted "with a proper limiting instruction").

> But a limiting instruction will not always be adequate to protect the Sixth Amendment rights of the declarant's co-defendants. In <u>Bruton v. United States</u>, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), the Supreme Court concluded that in certain instances-where a non-testifying defendant's extrajudicial statement is "powerfully incriminating" against other defendants-the statement may not be used in a joint trial at all. <u>Id.</u> at 126, 135-36, 88 S. Ct. 1620; <u>Vega Molina</u>, 407 F.3d at 518-19; <u>see</u> <u>also</u> <u>Gray v. Maryland</u>, 523 U.S. 185, 192, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998). In such a case, "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." <u>Bruton</u>, 391 U.S. at 135, 88 S. Ct. 1620.
>
> * * *
>
> <u>Bruton</u>, however, applies only to a statement that is "inculpatory on its face," <u>Vega Molina</u>, 407 F.3d at 520 (citing <u>Richardson</u>, 481 U.S. at 207, 107 S. Ct. 1702). "Statements that are incriminating only when linked to other evidence in the case do not trigger application of <u>Bruton</u>'s preclusionary rule." <u>Id.</u>; <u>see</u> <u>also</u> <u>Richardson</u>, 481 U.S. at 209, 107 S. Ct. 1702 (rejecting extension of Bruton to "confessions incriminating by connection").

<u>United States v. Rodriguez-Duran,</u> 507 F.3d 749, 768-69 (1st Cir. 2007), <u>cert.</u> <u>denied,</u> — S. Ct. —, 2008 WL 512742 (Mar. 24, 2008).

Neither Defendant Edouard's nor Defendant Celestin's confessions (including those made to law enforcement and during the Rule 11 plea colloquy) presents prejudicial joinder problems. At bottom, neither of these admissions names the other co-defendant or otherwise implicates him in the conspiracy, either directly or indirectly. <u>See</u> <u>Vega Molina</u>, 407 F.3d 511, 521 (1st Cir. 2005) (holding that admitting co-defendant's confession did not violate <u>Bruton</u> or <u>Richardson</u> when the testimony "failed to convey a compelling inference that the 'other individuals' to whom the [confessing defendant] referred were [the other co-defendants]", especially when "the statement pointed explicitly to a deceased coconspirator" and therefore "raised the distinct possibility that people besides those who were on trial may have been involved in the commission of the crimes"), <u>cert.</u> <u>denied</u>, 546 U.S. 919 (2005). Thus, a limiting instruction that

15

each defendant's confession may not be used against the other defendant is appropriate — and all that is required — under these circumstances.[3]

The government notes that a slightly different analysis applies to the admission of co-conspirator statements outlined in section IV above. Indeed, co-conspirator statements made in furtherance of a conspiracy are admissible notwithstanding Crawford or Bruton. United States v. Malpica-Garcia, 489 F.3d 393, 397 (1st Cir.), cert. denied, 128 S. Ct. 316 (2007); United States v. Sanchez-Berrios, 424 F.3d 65, 75 (1st Cir. 2005), cert. denied sub nom. Cruz Pagon v. United States, 546 U.S. 1125 (2006).

        Respectfully submitted,

        MICHAEL J. SULLIVAN
        United States Attorney

By:    */s/ James P. Dowden*
       JAMES P. DOWDEN
       SCOTT L. GARLAND
       Assistant U.S. Attorneys

---

[3] The United States will brief this issue in more detail when it responds to Defendant Celestin's motion to sever.

CERTIFICATE OF SERVICE

    I, James P. Dowden, Assistant U.S. Attorney, do hereby certify that I have, on May 9, 2008, caused a true and accurate copy of the foregoing to be served upon all counsel of record by filing the document with the Court electronically and by serving a copy of the foregoing on Defendant Edouard by U.S. First Class Mail.

                                              */s/ James P. Dowden*
                                              JAMES P. DOWDEN
                                              Assistant U.S. Attorney